## Case No. 5,084.

### FREEMAN et al. v. BAKER.

[Blatchf. & H. 372.] [1]

District Court, S. D. New York. May 14, 1833.

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

Edwin Burr·and Erastus C. Benedict, ·for libellants.

David D. Field, for respondent.

BETTS, District Judge. It is urged, on the part of the respondent, that the provisions of the 6th section of the act of congress of July 20, 1790 (1 Stat. 133), apply equally to suits in personam and to suits in rem; and it is argued that such a construction must be given to that section, in order to effectuate the general intent of congress. The statute has, in its terms, reference only to proceedings in rem; and, if its language be susceptible of a broader import, so as to be made applicable to all other forms of suit, there ought to be very manifest and urgent reasons for giving it such effect, to induce the court to depart from its letter and plain purpose. The act varies the maritime law under which seamen acquire a right to prosecute in admiralty, and, instead of enlarging and rendering more efficacious the remedies they before had by that law, modifies and restricts their remedies in a very important particular. Before the statute, a sailor could immediately attach the vessel for his wages, when the voyage was ended, or whenever he was entitled to an advance. The act, with a view to protect the interests of ship-owners and merchants, now requires that the seamen shall wait ten days after the voyage is ended and the ship is unladen, and that then he shall summon the master to show cause, before he is entitled to arrest the vessel by admiralty process. As the regulations of the statute are in restraint of the privileges of seamen, and do not create a right to sue in this court, (that right having been coeval with the institution of the court itself,) but abridge the right, in this par-

ticular, in favor of the merchant, the operation of the act should, by well-settled principles of interpretation, be limited by the courts to the identical case specified in it. The act has, accordingly, been accepted in this court as having regard to proceedings in rem alone; and that application of it is corroborated by the explicit reservation, in the statute, of the right of the seaman to an action at common law, where the right of action accrues as soon as the wages are due. When the remedy is pursued against the master or owner individually, no reason is disclosed by the act, indicating that congress intended to place seamen on a footing different from other suitors, or to provide their debtors with any further privileges in admiralty than are possessed by other parties defendants at common law. There would, however, be reasons of weight for preventing mariners from arresting a vessel so abruptly. They might thereby, often interrupt and put at hazard vital operations in navigation and commerce, or at least impose heavy expenditures and losses upon shipowners, which they would never be able to reimburse. It would, therefore, be a provident safeguard, to place under careful restrictions this method of procedure against a ship; and the act wisely provides, that before this advantage can be had, the sailors shall give the master or owner an opportunity to satisfy their wages, and that then they shall not be permitted to seize the vessel without showing, before a proper magistrate, probable cause for the proceeding. There seems to be no reason why the act should be carried further by construction than to ensure the fulfilment of that main object. It will, accordingly, not be held to apply to actions in personam prosecuted in admiralty. The arrest of the master or owner, and holding him to bail, when the voyage is ended, would interpose no impediment to the preparation of the ship for further employment, or to her pursuing the one then on hand, and would be a reasonable privilege to seamen against transient or non-resident masters or owners. The libellants, therefore, commenced their suit correctly in this case, without waiting ten days after ·the completion of the voyage, and without summoning the master to show cause, provided, however, the voyage was ended when the suit was instituted; because, a sailor acquires no right of action for his entire wages until the period of his service is completed.

The statute specifies some particulars which evince the termination of the voyage—as, that the vessel is at her last port of destination, and her cargo or ballast is fully discharged. But I think it is a mistake to suppose that congress contemplated making the full discharge of the cargo or ballast an absolute and inflexible requirement or pre-requisite to the completion of a voyage. The terms of the act are, that the wages shall be due as soon as the voyage is ended, and the cargo or ballast be fully discharged at the last port of delivery. It is obvious that a voyage may be ended, to all legal intents, without the arrival of the vessel at her last port of delivery. The misadventure or sale of the vessel, the abandonment of the voyage by the owner. the transshipment of the cargo at sea, the discharge of the seamen at an intermediate port, with or without their consent, as also acts of hostility or restraint by foreign powers, may terminate the voyage elsewhere than at the last port of delivery; and it cannot be supposed that congress meant to designate the arrival of the vessel at her last port of delivery as the only event which could end the voyage and entitle the seamen to their wages. So, with regard to the other provision of the act, respecting the full discharge of the cargo or ballast, it is not to be intended that congress has left it to the option of the owner when he will unlade his vessel, or whether, indeed, he will ever fully discharge the cargo or ballast. No time is limited by the act, within which he is required to do either. Instances undoubtedly occur, in long and unfortunate voyages, where the arrears of wages exceed the value of the vessel and her cargo, and it would be to the interest of the owner to suffer both to perish in port, if he could thereby excuse himself from the payment of wages. It follows, then, that neither the ending of the voyage at the port of discharge, nor the delivery of the cargo, should be regarded as conditions precedent to the right to sue for wages; and the courts ought not to interpret the act as expressing, with invariable certainty, the circumstance necessary to compose a mariner's right to sue for his wages. The statute should rather be understood as fixing a period beyond which wages cannot be withheld from a sailor, whatever stipulations to the contrary may be inserted in his contract. This motive alone would sufficiently call for the enactment of the law.

In the present case, the clause of the statute adverted to has been incorporated in the shipping articles. The seamen engage that they shall not be entitled to, and will not demand their wages until the arrival of the vessel at the last port of discharge, and her cargo delivered. But this covenant can have no further or other effect than the statute, the words of which it adopts. The contract must be expounded as if it rested upon the statute alone. The law benignly shields mariners from the effect of agreements into which they may be drawn, beyond what strictly appertains to a shipping contract; and the obligation of the statutory provision, as against them, cannot be enlarged by any stipulations into which they may be drawn, unless the purport of those stipulations is fully and fairly explained to them, and an additional compensation is allowed, entirely adequate to the new obligations imposed.

The Minerva, 1 Hagg. Adm. 347; The George Home, Id. 370; The Prince Frederick, 2 Hagg. Adm. 394. The right of action of the libellants was perfect when this suit was commenced, although the cargo was not fully unladen. The obligation to postpone their demand of wages until the delivery of the cargo, was correlative to their obligation to remain with the vessel until that time, the wages being the consideration for the bargain for the services. Having been separated from the vessel by the act of the master, and with their own consent, both their service and the time for which their wages are to be estimated, ceased. Their release or acquittance from the performance of their contract, imparts the same rights to them that they would have possessed had it then ended according to its terms, and by full performance on their part. The preliminary objections are, accordingly, overruled.

The defence of a forfeiture of wages applying to Freeman, one of the libellants, will be next considered. Admitting that the entry produced from the log-book is regular, it appears to me, that a forfeiture cannot be maintained in this case, because Freeman left the vessel, for a reasonable cause, not clandestinely or with the intention of deserting, and because there was a subsequent condonation of the offence and remission of the forfeiture, had any been incurred, by the act of the master in taking him back to service. Abb. Shipp. (Ed. 1829) 464, 468, 472, note. The stipulation in the shipping articles, which has been set up as working a forfeiture of wages, would, on the interpretation now claimed, extend as well to every act of disobedience, however harmless and trivial, and to every truant absence beyond the moment of leave granted, as to acts of insubordination and of flagrant desertion of the vessel; and it requires no comment to show, that if such a stipulation were enforced to the letter, no seaman would have a legal remedy for wages left him, but must depend upon the generosity of the owner and master, whether his services should be compensated or not. Had it not been notorious that the principles upon which courts of admiralty administer the law in respect to the engagements of seamen, would prevent any construction of the shipping articles, so destructive of their rights, the legislature would, without doubt, have interfered for their protection against their own contracts, as they have shielded them already in matters of less vital consequence to their interests, and would have left them under the security of judicial authority. Abb. Shipp. 464, 468, 472, and cases cited in notes. The courts, by interpreting and executing the stipulations of seamen, in consonance with the subject matter to which they relate and with the character of the parties entering into them, have effectuated an adequate guardianship over seamen, without depriving the owner and master of any just rights.

Such stipulations are considered as nothing more than penalties held over the seaman in terrorem, and under which nothing more will be awarded to the owner or master, than an indemnity for injuries sustained by the misbehavior of the seaman, and nothing more imposed on the seaman than a punishment, by way of fine, for his misconduct. In that way, the courts are able to regulate the amounts chargeable against seamen by force of such covenants, conformably to the demerits of each individual case. The Mentor [Case No. 9,427]. The ground of defence taken upon this point is, accordingly, overruled.

The remaining inquiry is, as to an allowance against the libellants of the physician's bills at St. Jago de Cuba, which were paid by the master. By the maritime law, all charges for medicines, nurses, physicians, &c., furnished to or provided for a seaman, during the progress of a voyage, when his disability is not the immediate consequence of his misconduct, are imposed on the vessel. Jus Marit. Hans. (Ed. 1667, Hamb.) tit. 14, arts. 1, 2, pp. 72, 73; Laws of Oleron, arts. 6, 7; Laws of Wisbuy, art. 18; Harden v. Gordon [Case No. 6,047]. This principle of the maritime law has been eulogized by distinguished writers for its practical wisdom and its enlightened humanity; and eminent judges in this country have questioned the policy of the change made by statute on this subject, and have favored the limitation of the act of congress to the strictest reading of its letter. Walton v. The Neptune [Id. 17,135]; Swift v. The Happy Return [Id. 13,697]; 3 Kent, Comm. 184, 185; Abb. Shipp. 145, 146. The course of this court has not been to compare the act of congress with the law which it supersedes, in view of their relative adaptation to the interests of navigation or of seamen; but, receiving the statute as the only existing law on the subject, it has endeavored to carry the statute into effect according to its fair import and policy. In remitting the master to the responsibilities imposed by the maritime law, on his failure to obey the directions of the act, congress admit, by strong implication, that that law has full force, except in so far as the statute interferes with and modifies it. When, therefore, a master attempts to shield himself from the obligations of the maritime law with respect to sick seamen, it is incumbent on him to show, by very clear and satisfactory proofs, that he has complied with every requirement of the statute in that respect. The statute substitutes a new provision for sick seamen, under particular circumstances and conditions; and, before a master can claim its application, he must give satisfactory evidence that he has fulfilled those circumstances and conditions. Harden v. Gordon [supra]. If the answer could be received as evidence for the respondent in this respect, it is expressed in terms so loose and equivocal as to leave room to doubt whether

the requisitions of the statute have been complied with by the master. It gives the opinion of the master that he had done what was enjoined by the law, but does not set forth the facts so that the court may determine how far they correspond with and satisfy those requirements. An answer of this description is of no other avail than to admit the respondent to support its allegations by testimony aliunde. None such is offered; and, as the case is presented to the court, there is not only a want of proof that the vessel was furnished with a medicine-chest and directions in the mode pointed out by the statute, but there is an absence of all legal evidence that any medicine-chest was on board.

Nor can the engagements of the libellants to pay the physician's charges avail the respondent. The agreement was without consideration, and was made under the exigencies of a dangerous and alarming malady. Agreements of sailors with a master, on board of a vessel, in derogation of their rights and interests, are seldom regarded in courts of admiralty, especially when those engagements have relation to other matters than the terms and limits of their shipment. A higher objection still remains to promises of this character. The master would, by them, discharge himself of an obligation imposed upon him by positive law, and which the interests of humanity and commercial policy require should be fulfilled on his part with fidelity. This part of the claim of the master against the libellants is, accordingly, rejected. The residue of the accounts, which is undisputed, is allowed.

The offer made by the respondent, before suit brought, to pay the wages, deducting the physician's bills, cannot avail to excuse him from costs. Decree for libellants, with costs.